## BALLARD *v.* HITCHCOCK MANUF'G CO.

*(Supreme Court, General Term, Fourth Department.  July, 1891.)*

ACTION FOR INJURIES—EVIDENCE—DECLARATIONS OF PERSON IN CHARGE.

In an action to recover for the death of plaintiff's testator, caused by a boiler explosion, the declaration of a person employed to run the engine, made in conversation with others, respecting the necessity of certain repairs of the boiler to be made, and the thoroughness of others that had been made, were improperly ad-

mitted on behalf of plaintiff, where it also appeared that such person was only em-
ployed to run the engine, and that there was a superintendent and assistant en-
gineer in charge of the entire works, and its boilers and engines, who were dece-
dent's superiors, and who, instead of him, stood in place of the master.

Appeal from circuit court, Cortlandt county.

Action by Ellen I. Ballard, executrix of William P. Ballard, against the
Hitchcock Manufacturing Company, to recover for injuries causing the death
of plaintiff's testator. From a judgment entered on the verdict of a jury,
and from an order denying a motion for a new trial, made on a case and ex-
ceptions, and from a judgment entered thereon, defendant appeals. For for-
mer report, see 4 N. Y. Supp. 940; 5 N. Y. Supp. 952.

Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

B. A. Benedict, for appellant.    Franklin Pierce, for respondent.

MERWIN, J.    The defendant is a corporation engaged in the manufacture
of wagons and sleighs at Cortlandville, and was such on and prior to May 30,
1887. At that date William P. Ballard, whom the plaintiff represents, was
in its employ, and received injuries from the explosion of a boiler, by reason
of which he afterwards died. This boiler was used by the defendant in its
works for the purpose of generating steam for propelling one or more engines
used in defendant's factory. The claim of the plaintiff is that the explosion
was the result of negligence on the part of defendant. The important if not
the main issues at the trial were whether the explosion was caused by a defect
along a horizontal seam of the boiler, and whether the defendant had notice
of this defect. Upon the subject of notice and consequent neglect, the plain-
tiff was permitted to prove declarations made to or by one William Howard,
who was an engineer in defendant's employ. Prior to giving the evidence,
it appeared that Floyd Hitchcock was the general superintendent of the con-
cern, giving his personal supervision to all the affairs and departments; that
he had an assistant, Mr. Bennett, whose duties were to look after the entire
works, including the boilers and engines; that Caleb B. Hitchcock was the
president of the defendant, had an office there, and was giving his personal
attention to the business, and Mr. Gleason, a director, had an office there, and
was an active member of the concern. The other directors were Caleb B. and
Floyd Hitchcock. Upon the subject of the position or duties of Howard,
Floyd Hitchcock, upon the examination of plaintiff, testified as follows:
"Question: Who was your engineer there? Answer. Mr. Howard. Q. Who
saw to the repairs on the boiler,—who looked after that? A. Well, Mr.
Howard had charge of that. Q. Who paid the help for making the repairs
on the boiler? A. Sometimes Mr. Howard paid for it; sometimes Mr. How-
ard might have paid for it, or ordered it paid. If we had any one do the
work, he would naturally make the order. Q. He suggested the help that
should be hired about the boiler? A. Mr. Howard, being the engineer, would
naturally suggest any help he wanted around the boiler. Q. Mr. Howard in
fact had control of those boilers, fixing and making the repairs? A. He had
control of the boiler, practically; he generally conferred with myself or Ben-
nett." Upon cross-examination he testified: "Question. When you say he
had control of the boilers you mean he ran the boiler? Answer. Yes, sir.
Q. As any engineer runs his engine? A. As chief engineer. Q. That is all
there was of it? A. Yes, sir. Q. The business was under your supervision,
and that of the president? A. Yes, sir." He also testified that the help, in-
cluding the men who worked about the boiler, got their pay from the treas-
urer of the company at the office there. Mr. Keese, the treasurer of the de-
fendant, upon the examination of the plaintiff testified: "The engineer, Will-
iam Howard, had charge of the boilers down at the Elm-Street factory. He
had charge of them at the time of this explosion. I can't tell how long a
period before that he had charge of them. He may have had charge of them

before I came here: I cannot tell you. I have been here four years and a half. During that time he has had charge of them. I have been there four years and a half, and about two years before the explosion. During all of that period he had charge of these boilers, I think." Upon cross-examination he said: "I have been in the boiler-room, but not very often. I know positively that Mr. Howard was the engineer. He was simply the engineer running the boilers and the engine. When I say he had charge of them I mean to say he looked after the running of them. I suppose he had the general supervision of them; that is my idea of it. He simply filled the place of engineer." Other evidence was afterwards given by the defendant on the subject of Howard's position. It need not be here referred to, except to say that it at least was not more favorable to plaintiff. As to the declarations, the evidence is substantially as follows: John M. Osborne, a witness for the plaintiff, testified that he was a boiler-maker, and in the employ of the defendant from the summer of 1886 until the latter part of January, 1887. That in September, 1886, he was directed by Gleason to repair the boiler in question as to some leak in the fire-box, and did so. That afterwards, and in December, 1886, he was at the boiler-room, and Howard called his attention to a coloring on the bottom of the boiler, and he told Howard "the boiler would have to be fixed in that spot on the third ring,—didn't tell him how it would have to be fixed. He wished me to see them up to the foundry, [part of defendant's works,] and have them fix it. I did see Mr. Gleason and Mr. Saeger." That, in the fore part of January, Howard came after him, and he went and calked the horizontal seam where steam was escaping. That after he got through he waited for them to get up steam, and it was found that some steam still escaped, and that he said to Howard "that he must have it repaired, for I wouldn't stay there and run it for no money; and he asked me to get them to fix it. I said, ' You had better;' and he said, ' You can see them.' I told him it was dangerous, and he asked me to see them up to the foundry, and have it fixed." That in pursuance of this talk he saw Gleason at his office. These conversations with Howard were properly objected to, and exception taken. The plaintiff was also permitted to show by one Adams that on a subsequent occasion, in January or February, he was there calking the boiler, and he told Howard that the previous calking was done by some one not a practical man; and after he got through he told Howard it was liable to break out most any time, because he did not give it a thorough calking, and, if it leaked any more, to let him know the following Sunday, and he would thoroughly examine it. By one Barton, a night watchman, that the steam did escape after this time and prior to Sunday, and that on Saturday night he asked Howard if he should call on Adams to come and do the necessary repairs, and Howard replied, "No; it was good enough." By one Cady, that he called the attention of Howard to the safety-valve not working properly, and that when he left the employ of defendant, about the 15th May, 1887, he told Howard he did not think he should stay there any longer, for he did not think the boiler was safe. By one Bunn, that he told Howard he did not like these little leaks, and asked him if they could not stop them. By one Shirly, that he said to Howard, "Can't you get up steam so we can have the full amount on our machinery?" and Howard replied, "With the fuel I have, I can't do it; you can't keep it up. * * * We are using too much steam; had too much machinery attached to our engine for them to keep up with the boiler." That the witness told him it was not hardly safe to run the boiler in that shape, and Howard replied he thought that was no such thing; and "I don't think you know as much about this boiler as I do. I have the care of this boiler, and the charge of it." That on one occasion witness called Howard's attention to steam escaping in the direction of the dome, and asked him why he didn't have it calked, and he replied, "I have had it calked, but the man didn't understand his business, and didn't make it hold."

These statements were made to or by Howard while he was at work about the engine. It is conceded that they are material. It is to be observed that they include statements of the opinion of Howard as to past transactions. That is the case when, referring to a previous calking, he on one occasion says it is good enough, and on another occasion says the man did not understand his business, and it did not hold. How these opinions were, in any view, competent I fail to see. The competency of these statements is sought to be sustained by the plaintiff upon the theory that it was competent and proper for the court to submit to the jury the question whether or not Howard was at the time in sole charge of the boiler-room, and in sole charge of the repairs on the boiler, and, if so, that the statements bind the defendant; otherwise not. This the court, in substance, charged. It also charged that Howard was a fellow-servant with the deceased, and left to the jury the question whether he was standing in the place of the master. The evidence was not, in my opinion, sufficient to authorize the finding that Howard had sole charge, and it should have been so held as matter of law. *Crispin* v. *Babbitt*, 81 N. Y. 516. He was there as an engineer running the engines and boiler. There was a superintendent and an assistant, both of whom were the superiors of Howard, and who had charge of the entire works, including the boilers and engines. They, and not Howard, stood in the place of the master. In Wharton on Negligence, § 229, the rule is said to be that, where the employer leaves everything in the hands of a middleman, reserving to himself no discretion, then the middleman's negligence is the employer's negligence, for which the latter is liable. There was no such entire charge in this case. True, Howard had charge of the repairs, and might suggest as to any help he wanted around the boiler, but it was all under the superior and immediate care of the superintendent. This is, in substance, the testimony of witnesses called by plaintiff, and is not disputed. Osborne, who made the first repairs, was directed so to do by Gleason, an officer of the company. The interviews between Osborne and Howard, as testified to by Osborne, indicate that they both looked to Gleason to give further directions, and Osborne saw Gleason with that in view. Who employed Adams does not appear on the part of plaintiff. It subsequently appeared in the case that he was employed by the direction of Bennett, the assistant superintendent. So far as the ordinary running of the engine and boilers was concerned, Howard was only a co-employe. As to the repairs, it is quite clear that he did not have full or sole charge. It was not a part of his duty personally to make the repairs, nor was the duty on him to select and employ the parties who should do it. It seems to me that the plaintiff did not make a case for binding the defendant by the declarations to or by Howard, and that, therefore, they were improperly received. The foregoing considerations lead to a reversal, and it is not necessary to consider the many other questions raised, as upon another trial they may appear differently or not at all. Judgments and order reversed, and new trial ordered, costs to abide the event. All concur.