ELLEN I. BALLARD, as Executrix of WILLIAM P. BALLARD, Deceased, Respondent, *v.* THE HITCHCOCK MANUFACTURING COMPANY, Appellant.

*Master and servant — co-servants — duty of the master to furnish a safe working place — defective steam boiler — injury to an employee by the explosion of a boiler — liability of the master for negligent acts of the engineer in repairing the boiler — charge to disregard certain evidence.*

An employer owes to his employee the duty of using reasonable care and diligence to keep the place where the employee is required to perform the services in which he is engaged reasonably safe.

An employee of a manufacturing corporation was fatally injured by the explosion of a steam boiler, used to operate the machinery in his employer's factory, while engaged in tending a mason, who was laying up a brick partition wall between the boiler room and the adjoining building, at a point about twenty-five feet from the boiler. The executrix of the deceased employee brought an action against the employer, a corporation, to recover damages, on the ground that the employee's death was caused by the defendant's negligence in maintaining a defective and unsafe boiler, and gave evidence tending to show that for several months before the accident, a seam of the boiler had leaked, and that it had been calked in an improper manner, which the plaintiff claimed tended to weaken it.

*Held,* that it was the defendant's duty to keep its boiler in suitable repair, and that in the discharge of that duty it became incumbent upon the defendant to make use of the proper instrumentalities in causing the repairs to be made.

Evidence was given to the effect that after a leaky horizontal seam in the boiler had been calked by two men, employed for that purpose, and a director of the defendant corporation had been informed that the seam was defective and needed repair, the leak continued, and the calking was done thereafter down to the time of the explosion in question, a period of some four months, by the defendant's engineer, who was engaged in operating the engine and boiler under a superintendent and assistant superintendent. The plaintiff claimed,

and introduced evidence tending to show, that the calking was imperfectly done, and produced grooves in the boiler along the leaky seam, which weakened the boiler and led to the explosion.

*Held*, that, upon all the evidence, it was a question whether the corporation defendant, by any of its agents, failed to exercise due care to prevent injury to the plaintiff's testator, from defects in or improper repairs to the boiler, near which he was required to discharge his duties ;

That the evidence warranted the submission to the jury of the questions whether the boiler exploded at the horizontal seam through the grooves, caused by the improper calking, and in consequence of the improper calking ; by whom this negligent calking was done ; and if done by the engineer, whether he was authorized by the defendant to do the calking ; and whether the engineer represented the defendant in respect to the matter complained of, or occupied the position merely of co-servant with the deceased ;

That the jury having found that the engineer, as well as the two persons who first calked the boiler, were discharging the duties of the master in calking the boiler, and that a failure to perform that duty was the failure of the master rather than the failure of a co-servant, the defendant was chargeable with the engineer's negligence.

Where the court instructs the jury to disregard testimony improperly received, and there is other evidence to support the verdict, it will be assumed that the instructions were obeyed and the error in the admission of the evidence will be cured.

APPEAL by the defendant, the Hitchcock Manufacturing Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of Cortland county on the 14th day of January, 1892, upon a verdict rendered at the Cortland Circuit, and from an order of Special Term denying the defendant's motion for a new trial made on a case and exceptions.

The defendant is a domestic corporation carrying on business in the village of Cortand, owing two large buildings " full of machinery, viz., punches, shears, trip hammers, saws, planers, shapers, sanders and mortise machines. For the purpose of creating the power to run such machinery, and of the steam to heat said two buildings, defendant had in said two buildings three tubular boilers and three engines, one of which boilers was known as the big boiler and the other two as the old boilers." On the 30th of May, 1887, William P. Ballard died, leaving a last will and testament which was proved in Cortland county and letters testamentary thereunder were issued to the plaintiff. Plaintiff's complaint alleges that her testator, on the 30th of May, 1887, " was in the employment of the defendant, tending a mason by the name of Franklin H. Scott,

who was laying up a brick partition wall immediately in front of and near by said big boiler and between the boiler room and the adjoining building. That plaintiff's testator was employed by defendant to perform services in a part of the said wooden building remote from the place where said big boiler was situated; * * * he commenced upon the performance of said work unwarned by defendant of the defective condition of said boiler." It is also alleged "that for want of due care and attention to its duties towards its employees, * * * and while the plaintiff's testator was in the employ of defendant, and in said employment was working within a few feet of said boiler, in the capacity as aforesaid, and without any contributory negligence or fault of plaintiff's testator, the boiler known as the big boiler, by reason of said unsafeness, said defectiveness, of said neglect of defendant, * * * exploded * * * and plaintiff's testator received severe and mortal injuries therefrom," and in consequence of said injuries died on the 30th of May, 1887.

The answer of the defendant denies that the injuries were received by plaintiff's testator through the carelessness, negligence or improper conduct of the defendant, etc.

*B. A. Benedict,* for the appellant.

*Franklin Pierce,* for the respondent.

HARDIN, P. J.:

On the morning of the 30th of May, 1887, when plaintiff's intestate received the injuries from which he died, he was at work attending a mason, who was building walls for a room, and was at a point about twenty-five feet from the large boiler used by the defendant for running its machinery. Defendant's large boiler, which had been in use some two years and was sixty-six inches in diameter and sixteen feet long, containing 103 three-inch tubes, exploded, causing the death of plaintiff's testator. His body was found about twenty feet from where the front end of the boiler was when it exploded. Evidence was given tending to show that the boiler had been out of repair for at least four months before the time of the explosion. In January, one Osborn was called upon to repair the first horizontal seam on the right side of the boiler looking from the front, which

seam ran along underneath the dome of the second section of the boiler; he repaired the whole length of the seam by "calking it." Upon attempting to use the boiler, the calking was blown out, and some evidence was given tending to show that it was weakened along the seam. Thereafter Adams was called, and again calked the boiler along the horizontal seam. The boiler was leaking steam, and it was difficult for him to make a firm job, and he used a testing tool, going along the seam to stop the leaking. Osborn stated, as a witness, that the calking done by him "was not a good job." He made explanations, and attempted to show William Howard, the engineer, how to do the calking. Before Osborn left he called upon Gleason, one of the directors, and informed him that this seam in question was defective, and needed repair. Evidence was given tending to show that after the calking was done by Osborn and Adams, the boiler continued to leak steam along the horizontal seam more or less down until the time of the explosion; and that Howard continued calking along the horizontal seam from January until the time of the explosion. During the trial, a portion of the horizontal seam claimed to have been injured by the calking, was brought before the jury, and the injuries thereto were pointed out by the witness, Professor Thurston, an eminent writer on the subject of boiler explosions, and he testified that the calking along the edge of the lap was not well done; also, "the metal being chipped first by a chisel to a smooth, even bevel, from the upper to the lower surface of the sheet, and then the calking tool would be applied so as to produce a change in the thickness of that bevel, by forcing the iron on the lower edge against the iron on the lower sheet so as to seal that leak. Improperly done, the calking would produce an irregular edge such as is seen at these several points upon which I place my finger, where the iron has been forced back and the straight line on the edge has been broken and the edge of the sheets upset, and the metal forced in between it and the lower sheet. The depth of the cut in the lower sheet, I should say from its appearance as lying there on the table, it was nowhere more than one-sixteenth of an inch, and in many places less. The tendency in that cut, of expansion and contraction, would be to produce a line of fracture, * * * and the effect would be to produce a fracture such as is seen in bend-

ing a piece of tin along a certain definite line. * * * The calking is designed to close that seam and prevent the leak, but this wedging action would open it still further." He also testified that an explosion only occurs where there is a general weakness along considerable line of space, and that he found such a line of weakness along the horizontal seam; and he added that the break from rivit to rivit would contribute to make this a general line of weakness and cause the explosion. Other evidence was given tending to indicate that the horizontal seam had been badly calked, and the weakest part of the boiler was in the horizontal seam. When this action was before the court on the first appeal (51 Hun, 188), in the course of the opinion delivered by KENNEDY, J., it was assumed that the defendant " was required to exercise reasonable care and diligence to ascertain that the machinery is reasonably safe and fit for the purposes to which it is to be applied." Plaintiff's testator was entitled to " a safe and proper place in which to prosecute his work;" and it was the duty of the defendant to furnish him such a place, and the defendant is liable for a failure to discharge such duty if the injury was occasioned by the non-performance of such duty. (_Pantzar_ v. _Tilly Foster Iron Mining Company_, 99 N. Y. 368.) The rule is repeated in _Probst_ v. _Delemater_ (100 N. Y. 272), by RUGER, Ch. J., in the following language : " The duty of the master to furnish safe, suitable and sound tools, machinery and appliances for the use of the servant in the performance of the work of the master, and to keep them in repair, is not an absolute one, and is satisfied by the exercise of reasonable care and prudence on the part of the master in the manufacture, selection and repair of such appliances. This is a duty which cannot be delegated to a servant, so as to excuse the master from damages occurring through an omission to perform it, yet when the master has exercised all of the care and caution which a prudent man would take for the safety and protection of his own person, the law does not hold him liable for the consequences of a defect which could not be discovered by careful inspection or the application of appropriate tests to determine its existence." The doctrine was again repeated in _Fredenburg_ v. _Northern Central R. R. Co._ (114 N. Y. 582), in which case it is asserted to be the duty of the master to use care to make the place reasonably safe for its employees.

The rule is again approved in *Dobbins* v. *Brown* (119 N. Y. 188), and it is there said the neglect must be proved by direct evidence, " or by proof of facts from which the inference of negligence can be legitimately drawn by the jury; " and it is added: " The mere fact that an accident occurred which caused an injury, is not generally of itself sufficient to authorize an inference of negligence."

In *Butler* v. *Townsend* (126 N. Y. 110), FINCH, J., in delivering the opinion, says: " The rooms in a factory have been deemed 'places' for work which the master was bound to make safe by the exercise of reasonable care." From these cases it is apparent that the duty that the defendant owed to the deceased was to use reasonable care and diligence to keep the place where he was required to perform the services in which he was engaged reasonably safe and shielded from injuries like the one caused by the explosion. It is, therefore, the defendant's duty to keep its boiler in suitable repair, and in the discharge of that duty it became incumbent upon the defendant to make use of the proper instrumentalities in causing the repairs to be made. The trial judge submitted to the jury the question of whether the duty of keeping the boiler in proper repair was discharged; and incidentally in that connection he submitted to the jury to say whether Adams, Osborn and Howard, in their efforts to put the boiler in a suitable condition, were the efforts of the defendant. Defendant, by delegating the performance of that duty to Osborn, Adams and Howard, made them its representatives, and for the time being they stood in the place of the defendant in the discharge of that duty.

When this case was before us on the second appeal (39 N. Y. St. Repr. 842), it was said in the course of the opinion that " The evidence was not    *    *    *    sufficient to authorize the finding that Howard had sole charge, and it should have been so held as matter of law. (*Crispin* v. *Babbitt*, 81 N. Y. 516.) He was there as an engineer, running the engines and boiler. There was a superintendent and an assistant, both of whom were the superiors of Howard, and who had charge of the entire works, including the boilers and engines. They, and not Howard, stood in the place of the master; " and later on in the opinion it was said: " So far as the ordinary running of the engine and boilers was concerned, Howard was only a co-employee. As to the repairs, it is quite clear that he didn't have

full or sole charge; it was not a part of his duty, personally, to make the repairs, nor was the duty on him to select and employ the parties who should do it." While we adhere to the opinion then delivered, we are also now of the opinion that the evidence warranted the judge in submitting to the jury the question whether the boiler exploded at the horizontal seam through the groove, caused by the improper calking and in consequence of the improper calking, and whether this negligent calking was done by Osborn, Adams or Howard, and, if it was done by Howard, whether he was authorized by the defendant to do the calking, and that upon all the evidence the verdict of the jury finding favorable to the plaintiff on those questions should be supported. While there is much adverse evidence in the case upon the subject, we think, under all the circumstances, that the question was one of fact for the jury to consider. It was said in *Mullan* v. *Philadelphia & Southern Mail Steamship Co.* (78 Penn. St. 25), that whether the servant represents the master in respect to acts complained of, or occupies the position merely of a co-servant, is a question of fact to be determined by the jury upon sufficient evidence warranting a finding to that effect. Upon all the evidence, it was a question "whether the corporation, by any of its agents, failed to exercise due care to prevent injury to the plaintiff's testator from defects" and improper repairs to the boiler in question, near which he was required to discharge his duties. (See *Bushby* v. *N. Y., L. E. & W. R. R. Co.*, 107 N. Y. 383.)

In *Penn. & N. Y. Canal Co.* v. *Mason* (109 Penn. St. 296), it was held: "A master is bound to furnish his servants with such machinery as is reasonably safe and suitable for the work. If he employ other servants to construct or repair such machinery, he is responsible to his servants, who use the machinery, for any negligence in the work of construction or repairing." In the course of the body of the charge, the trial judge submitted the question to the jury to determine whether the defendant, by its principal officers, had knowledge "and permitted Howard to do the calking;" and he added: "Then I charge you that that is equivalent to an authority. So that, if there was negligence in the calking of this seam, and it was done by Howard, under permission of the defendant, then the negligence of Howard is the negligence of the defendant and for

which the defendant is liable;" and he added: "If you shall find, however, that the seam was negligently calked and the calking was done by someone with the authority or permission of the defendant, then I charge you, gentlemen of the jury, that you shall find that the defendant has been guilty of negligence. If you find that the defendant has been guilty of no negligence, your verdict must be for the defendant." At the request of the defendant he also, charged: "The evidence must establish personal fault on the part of the defendant and master, or its equivalent thereto, and that the defendant is entitled to the benefit of the presumption that he has performed his duty until the contrary appears;" and he also charged: "That if the fault has been by an agent authorized to make these repairs by the defendant, that that is equivalent to a personal fault of the master." In various other expressions the judge repeated the substance of his charge, and refused in some instances special requests which he deemed a call from the counsel to express in different language the same idea which he had delivered to the jury in the body of his charge.

Our attention is called to *Brick* v. *Rochester, N. Y. & P. R. R. Co.* (98 N. Y. 211). The duties that Thompson was performing at the time of the injuries "were those of a fellow-servant and not of the master, and hence if he was chargeable with negligence, it was that of a fellow-servant and not of the master, within the principle of well-considered cases." It was, therefore, held in that case that it was error to hold the defendant liable for the negligence of Thompson. In the case in hand the jury have found that Howard, as well as Adams and Osborn, were discharging the duties of the master in calking the boiler, and that a failure to perform that duty was the failure of the master rather than the failure of a co-employee. Therefore, the case in hand differs from the *Brick* case.

Our attention is called to *Hussey* v. *Coger* (112 N. Y. 614), and in considering the facts in that case, the opinion at page 620 states: "It was no part of the duty of the master to remove hatches or direct the particular mode of doing so, any more than to direct workmen in the use of the tools with which they performed their work. There were customary and established modes of performing such services, and each employee was expected to do his work in

the manner and style to which he was accustomed, without special directions in respect thereto. It was entirely immaterial whether the superintendent undertook to perform the work of removing hatches or ordered it to be done by others; he was, in either case, engaged in performing the duty of a workman." We think that case differs from the one before us. We are of the opinion that no error was committed in refusing to grant a nonsuit at the close of the evidence.

(2) The trial judge permitted the jury to find that the defendant or its officers knew that Howard was calking the boiler at different times. The defendant asked the court to charge that there was no evidence that the defendant knew it, and that the affirmative evidence was that the defendant did not know it. The court declined and an exception was taken. We think the court was not in error. There was proof that defendant's officers were in and about the boiler room frequently, if not daily. There was proof that steam was seen or heard escaping on many different times and days, and the witness Cady says: "Mr. Howard would take the calking tools that was left there by this boiler maker, and an armful of gunny sacks and go up on the boiler. He would go up on the boiler with his gunny sacks and bags, and sit on them, and use the calking tools for calking, and would calk the seam more or less for several days; and sometimes when he came down off the boiler you couldn't see or hear scarcely any escape of steam, but it wouldn't last long before it would appear again, and he would go up again; sometimes it would be one day right after the next day; sometimes it would skip three or four days or a week." The witness Bailey testified that he had heard steam escaping; and the witness Barton says he noticed it on several occasions; and the witness Shirley says he heard it occasionally; he was in the boiler room nearly every day and heard steam in the direction of the dome. The witness Bunn testifies that he saw it several times; saw small quantities of steam. It is true that witnesses were called to gainsay the testimony given upon that subject by the plaintiff, and the evidence of the employees and officers presented to the contrary produced a conflict upon that subject which we think was properly referred to the jury, and that the verdict ought not to be disturbed, finding the essential facts as claimed by the plaintiff in that regard.

(3) We think the defendant was not prejudiced by allowing the witness Hitchcock to state in the course of his cross-examination in answer to the following question : " Did you know Mr. Howard was absent from the boilers and left Mr. Fuller there in charge ? " The answer of the witness was : " I presume he was out more or less." We think the statement made by the witness did not prejudice the defendant.

(4) A witness was called who testified that he went to Mr. Gleason and told him the condition the boiler was in. Thereupon the court observed : " The general statement that he told him of the condition of the boiler is not competent, and the part of the answer that he told him of the condition of the boiler may be stricken out, but you can read anything he said to him as to the condition of the boiler." An exception was taken to the ruling which we think presents no error. The witness then proceeded to state what condition he told him it was in, to wit, that it was " In a dangerous condition ; I thought it would have to be repaired ; I told him I had just been calking it ; I stated to him the condition the boiler was in ; I can't tell you what he asked me ; I can't tell the words exactly I said to him now and remember to word it word for word ; I can't do it, but I can tell what he did say ; I said to him the boiler was in a condition it would have to be repaired, and that right away ; and then he wanted to know how and in what way, and what it would cost, and I went on and gave him an explanation." Considerable more evidence was given touching the conversation had with Gleason in respect to the condition of the boiler and its need of repairs. Gleason was secretary of the company and was frequently in and out of the boiler room down to about the twenty-eighth of April. It seems to have been proper to give the information that was communicated to Gleason with a view of determining the extent of the knowledge of the defendant as to the condition of the boiler antecedent to the accident. (*Stephens* v. *Hudson Valley Knitting Co.*, 52 N. Y. St. Repr. 795.)

(5) It is claimed by the defendant that some error was committed by receiving evidence on the trial as to communications to Howard. When the defendant was about to give evidence to show that Howard was a competent man to do the work, the court stated that it had ruled that the communications to Howard were immaterial, and

the plaintiff's counsel stated that " We are willing that all the testimony bearing upon the competency of Howard may be stricken out." Thereupon the court observed to the jury : " You are to disregard all evidence as to Mr. Howard's competency, because the question as to the competency of Mr. Howard is no longer in the case."

Among the requests made by the defendant to charge the jury was the following : " That the declarations in evidence, made to or by Howard, as to the condition or safety of the boiler in question, are not the slightest proof of the condition or safety of the boiler, and the jury must not use or consider them in determining its condition or apparent safety." In response to that request the court observed : " I so charge you. And, gentlemen, there has been stricken out of the case all evidence of the declarations of Osborn and Adams to Howard in reference to the safety or defects of the boiler." To that response exception was taken by the defendant. Thereupon the defendant made the following request : " That said declarations to Howard, or Howard's failure to make them known to the defendant, or its officers, are not competent evidence as bearing upon the question of the defendant's having discharged its duty towards the deceased in the employment of competent fellow-workmen or otherwise, and the jury must not use or consider them in determining that proposition." The court responded : " I so charge you." It is to be presumed that the instruction to the jury was complied with. (*Holmes* v. *Moffat*, 120 N. Y. 159.) It was also held in that case that " Where the court instructs the jury to disregard testimony, improperly received, and there is other evidence to support the verdict, it will be presumed that the instructions were obeyed, and the error in its admission cured."

The foregoing views, as well as those expressed by SMITH, J., in an opinion delivered at Special Term, lead us to advise an affirmance of the judgment and order.

MERWIN and PARKER, JJ., concurred.

Judgment and order affirmed, with costs.