EGAN v. DRY DOCK, E. B. & B. R. CO.

(Supreme Court, Appellate Division, First Department. December 1, 1896.)

1. STEAM BOILERS—INSPECTION—QUESTION FOR JURY.

The jury are warranted in finding that a boiler encased in brick was not tested with the hammer test, on evidence that the corrosion which weakened it must have existed for months, and that the hammer test properly applied would indicate that weakness, though a witness testifies that on two occasions (one a few weeks before the boiler exploded) he saw the engineer go into the boiler, for the purpose of cleaning it, and heard him tapping with a hammer inside; there being evidence that, in cleaning a boiler, it is necessary or usual to strike the tubes and stays, to free them from incrustations, and there being no pretense of any other inspection by use of the hammer.

2. PERSONAL INJURIES—EXCESSIVE DAMAGES.

Where an employé, as the result of injuries caused by a boiler explosion, suffers pain for some time, is confined to his bed or chair for four months, and is unable to work for eight months, losing his wages of $12.25 per week, and has considerable expense for physicians, and there were indications of concussion of the brain and the spinal cord, and loss of power of motion and sensation, and there was partial paralysis of his leg for some time, and there was evidence that some of these symptoms existed at the time of the trial, and that the effects were likely to continue for some time, a verdict for $3,000 will not be disturbed as excessive.

3. FELLOW SERVANT.

One intrusted with inspection of a boiler is, as to performance of that duty, a representative of the master, and not a fellow servant of another employé not connected with the duty of inspection.

4. EXPERTS.

An expert in the inspection of boilers, who has stated facts rendering it quite certain that he was able, as he said he was, to express an opinion with some certainty as to the length of time corrosion of a piece of boiler iron must have existed, and who has stated that the least period it had been corroded was to be measured by months, though he has also said he could not tell with precision the length of time it had taken to bring it to any state of corrosion, may

state that, in his judgment, the corrosion existed at the time of a hydraulic test of the boiler, seven months before it exploded.

5. HARMLESS ERROR.

Error, if any, in admitting rules of the police department, which permit an engineer to operate only the boiler designated in his certificate, is harmless, where the jury are charged that it was not negligence for the defendant master to permit an engineer to operate a boiler other than that designated in his certificate.

6. EXPERTS—CROSS-EXAMINATION.

On cross-examination of an expert, passages from books, by authors whom he has admitted to be good authority relative to a test, the efficacy of which he has denied, may be read to him, and the question asked whether he agrees with what is there stated; the reference to the books not being for the purpose of making the statements therein evidence before the jury, but solely to ascertain the weight to be given his testimony.

7. BOILER INSPECTION—MASTER'S DUTY—STATUTORY REQUIREMENT.

An official inspection and test, pursuant to a statute, requiring all boilers to be annually tested by hydrostatic and atmospheric pressure, does not necessarily relieve the owner, in the absence of notice, information, or suspicion of any defect in the boiler, from the duty, as regards an employé, of making further tests.

8. SAME.

To excuse a master from liability for explosion of a boiler in actual use, it must have been inspected with care by a competent inspector, and at reasonably frequent intervals.

Appeal from circuit court, New York county.

Action by William Egan against the Dry Dock, East Broadway & Battery Railroad Company. From a judgment entered on a verdict for plaintiff, and from an order denying motion for a new trial, made on the judge's minutes, defendant appeals. Affirmed.

Argued before BARRETT, RUMSEY, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

John M. Scribner, for appellant.

Thomas P. Wickes, for respondent.

RUMSEY, J. On the second day of November, 1893, the steam boiler in the defendant's stable on East Fourteenth street, in the city of New York, exploded with great violence. A considerable portion of the building in which the boiler was situated was torn to pieces by the explosion, and fragments of the boiler were thrown across the street, with such force as to shatter the opposite buildings. Several persons were killed or injured by the explosion, and among those injured was the plaintiff, who brought this action to recover damages caused by the wounds he then received. After a trial of some length, he recovered a verdict for $3,000. The defendant moved for a new trial, upon the ground, among others, that the verdict was against the evidence, and that the damages were excessive; and that motion was denied. From the judgment afterwards entered upon the verdict, as well as from the order denying his motion for a new trial, he took the appeal to this court, which is now presented for consideration.

The defendant is a street-railroad company, running a line of horse cars over certain streets in the city of New York. The buildings on East Fourteenth street in which this accident happened were occupied as stables. The steam boiler which exploded was

used there for running an engine. The plaintiff was not employed in any way about the boiler, but he was a "hitcher," so called, whose duties were to hitch up horses, and take them outside to the cars, and to unhitch the teams to the cars when they arrived, and put them in the stable. He had nothing whatever to do with the boiler, or any occasion to be in the room where the boiler stood. So far as he was concerned, the boiler was neither an appliance furnished by the defendant for the plaintiff to use in his work, nor was it a tool in which he had any interest whatever. As to him, the obligation the law imposed upon the defendant, with regard to this boiler, arose out of its duty to furnish him a safe place in which to do his work. His employment kept him in the building in which this boiler was situated; and while it did not call upon him to work at the boiler, or to do any work connected with it, he was still required to be so near the place where the boiler was that, if the boiler was not safe to use, it necessarily was dangerous for him to be in the place where his duty called him to be. As the defendant saw fit to keep the boiler so near the stables that an explosion caused by a defect in it was liable to injure the plaintiff, as well as any other person whose duty called him to be within the limits liable to be affected by such an explosion, it was clearly within the place where the plaintiff was called upon to work; and its presence there imposed upon the defendant the duty of taking care that it was in reasonably safe condition, in performance of its quasi contract towards the plaintiff to furnish him a safe place to work in.

The nature of that contract is well settled by the authorities. The keeping of this boiler in the stables of the defendant was not the maintaining of a nuisance. It was perfectly proper that it should be kept there, because the manner of doing business required some means of furnishing power for the engine which it was necessary to use. Losee v. Buchanan, 51 N. Y. 476. Having the right to keep it there, the defendant was not called upon to insure its safety. Harley v. Manufacturing Co., 142 N. Y., 31, 36 N. E. 813. The duty imposed upon the defendant was simply to use such reasonable care to inspect it from time to time as might be necessary to enable it to see that the boiler was in a reasonably safe condition, and free from defects which would make it unsafe to use. Ballard v. Manufacturing Co., 71 Hun, 582, 24 N. Y. Supp. 1101; Id., 145 N. Y. 619, 40 N. E. 163. If it exercised that care, it would be free from any liability for damage which might occur by reason of a defect in the boiler, so long as such defect was not discoverable. Losee v. Buchanan, 51 N. Y. 476. But the reasonable care which it was called upon to exercise required the defendant to use such tests from time to time, in inspecting the boiler, as were ordinarily used for that purpose, and as would ordinarily enable it to discover any defects which might exist. This was a personal duty imposed upon the defendant. It was not a sufficient performance of this duty that the defendant had appointed a competent person to inspect, but the inspection must be properly done; and, if it was not properly done, the defendant was liable, however competent the person selected as an inspector might be. Durkin v. Sharp, 88 N. Y. 225;

Bushby v. Railroad Co., 107 N. Y. 374, 14 N. E. 407. So, it was required that the necessary tests should be made to enable the defendant to ascertain the condition of the boiler. If the usual and ordinary tests would enable the defendant to ascertain that condition, such tests were all that it was called upon to make. The duty of inspection was an absolute, and not a relative, duty. The defendant could relieve itself from liability by making such inspection as the conditions surrounding the boiler required. Usually, of course, its duty in that regard would be performed by employing only such ordinary tests as are generally applied, and have been found to be sufficient to indicate the condition of steam boilers. But if, by any act of the defendant itself, the boiler had been so placed that the ordinary and usual tests were not sufficient to indicate its condition, the defendant was not for that reason relieved from the necessity of making a proper inspection, so that it could ascertain whether or not the boiler was safe to use. That duty was an imperative one, and whether or not it could be performed by the application of any given test was a question to be determined by the condition of the boiler, its situation and location, and by considering whether the particular test would give indications as to the safety of the boiler.

Bearing in mind these rules of law, which are well settled, we are in a situation to examine the evidence for the purpose of seeing whether it was sufficient to present a question for the jury as to the negligence of the defendant. It is not disputed that the boiler was of good construction, made by reputable makers, out of good material. It had been used 10 years, but the life of a boiler, as appears from the testimony, is not to be determined by the number of years it has been in use. The witnesses say that a boiler may become so deteriorated as to be unsafe in 5 years, and it may last for 25 years or longer, under favorable conditions, and with proper care. So far as appears, this boiler had received proper care from the engineer; and it is claimed, and not disputed, that the engineer who was in charge of it at the time of this accident was a competent man, properly certified, and who understood his business thoroughly. It is quite true that this certificate authorized him only to run a boiler in Corlears street; but it is alleged, and not disputed, that it was not negligence for the defendant to employ him to run this boiler as well, although the certificate applied only to a boiler in another building. The boiler was set in this building in 1883. At that time it was surrounded with brickwork over its whole circumference, and for its whole length, leaving no part of the boiler exposed except the two ends and the dome. It seems that there was room underneath it, so that when it was not in use, and when it was cold, one could go below it, and examine the surface there; but whether that is so is not quite clear, and it is not very important. It is undisputed that none of this boiler above the bottom of the brickwork could be seen. After the boiler had exploded, it was found that a portion of it, extending from the dome down to the seams on one side, had been corroded on the outside, next the brickwork, so seriously that the thickness of the iron, which originally had been five-

sixteenths of an inch, had been reduced to about one-sixteenth. The explosion had occurred at this place in the boiler, and it was this weakness which caused it to explode.

It is required by the consolidation act (section 310) that every steam boiler in use in the city of New York should be annually inspected by a practical engineer detailed for that purpose by the board of police, and the strength and security of each boiler should be tested by atmospheric and hydrostatic pressure. It was shown, and not disputed, that this boiler had been inspected as required by that statute. The last inspection took place in the latter part of April, 1893. At that time the boiler was tested to a pressure of 135 pounds to the square inch, and a certificate was given that it might be used with a pressure of 90 pounds to the square inch. The engineer was killed by the explosion, but it was made to appear by the testimony of a witness who was familiar with the boiler, and who had left the boiler room less than five minutes before the explosion, that the pressure of steam just as he left the boiler room was about 60 pounds to the square inch. All these facts are undisputed. The plaintiff claimed that the weakness caused by the corrosion was not likely to have been discovered by the application of the hydrostatic test, and that, accordingly, the application of that test was not such an inspection as the defendant was called upon to make. He claimed, further, that the boiler should have been inspected by what is known among engineers as the "hammer test," and that the application of that test would have enabled the inspector to discover the corroded place sufficiently to know that the boiler was weak at that place, and that it required more particular examination as to its safety.

These claims of the plaintiff were practically denied by the defendant; and the question litigated and submitted to the jury was, in the first place, whether the application of the hydrostatic test was a sufficient inspection to satisfy the duty which the defendant owed to the plaintiff, and, if that were not a sufficient inspection, whether the application of the hammer test would have enabled the defendant to discover the condition of the boiler, and that it was unsafe to use, and whether the hammer test was, in fact, applied with ordinary care.

Upon the first point there was evidence tending to show that this corrosion, which weakened the boiler to the point of explosion, had probably been the work of some considerable time; and that it must have existed to some extent at the time when the hydrostatic test was last applied, in April, 1893, though, of course, the precise extent to which it existed at that time was a mere matter of speculation. The expert witnesses who swore upon the subject were able to say, however, that, in their judgment, it was the work of some months to produce such a corrosion as existed at the time when the explosion occurred, and that the boiler must have been corroded in April, when the hydrostatic test took place. It was clear from all the testimony that, whether the boiler was weakened or not by the corrosion at that time, the hydrostatic test had failed to disclose any weakness which would prevent the boiler from sustaining a steady pressure of

135 pounds to the square inch, applied by the use of water at a moderate temperature. The expert witnesses for the plaintiff, however, testify that steam pressure is exerted under such entirely different conditions from those which existed when the hydrostatic test was applied that it could not be presumed that a boiler which would bear 135 pounds pressure under the hydrostatic test would endure anything like that amount of steam pressure, imposed under such different conditions. They were unanimous in their opinion that the hydrostatic test was not a proper mode of inspection to ascertain the safety of a boiler, but that some other test should be applied. They also testified that the usual and ordinary test to be applied in such cases was the hammer test; and that even in the case of a boiler like this, and entirely inclosed as it was, the hammer test might have been applied; and, if applied, it would have enabled a competent inspector to discover this weakness of the boiler, which was on the side of the boiler, and just below the upper surface of the tubes. This testimony was denied by the testimony of the defendant's experts. Their judgment was, in the first place, that the hydrostatic test was sufficient. They testified that it was the usual and ordinary test, and that some competent inspectors relied upon it to the exclusion of any other. They said that, while the hammer test was used, its use was not necessary to enable an inspector to discover the condition of a boiler. They testified, too, that in this particular case it would be impossible to apply the hammer test, by reason of the narrow space between the tubes and the shell of the boiler; and that, if applied, the fact that the boiler was entirely inclosed with brickwork, which touched its surface, would deaden the sound made by the blow of the hammer, so that the inspector would be unable to ascertain the condition of the boiler in that way. The plaintiff's experts, as we have said, denied this. There was a very considerable amount of evidence given on this subject by experts on behalf of both sides, who were conceded to be competent to give opinions on that point; and, at the close of the testimony, it was left in great doubt, upon the evidence, whether the hydraulic test was sufficient to enable the inspector to ascertain the condition of the boiler, and whether the hammer test, could have been applied to it, or, if applied, whether it was efficient to give indications of its condition to a competent inspector. These questions were clearly for the consideration of the jury, and, in our judgment, it was necessary that they should have been submitted to its decision.

As we have seen, the duty of the defendant could not have been properly performed unless it used the ordinary means of inspection, which would enable it to ascertain the condition of the boiler. Whether the means which it used were the ordinary means, or whether other means should have been used, was the subject of conflicting testimony. So, also, there was testimony upon the question whether or not there might have been such a change in the condition of the boiler after the April inspection, by the hydrostatic test, as that ordinary care would require a new inspection to be had subsequent to that time, to say whether the boiler was safe. All these questions were properly submitted to the jury, and there was

evidence, as we think, upon which it might have reached the conclusion which it did.

But it is said by the defendant that, if the hammer test ought to have been applied, the plaintiff failed to prove that it was not so applied. The evidence upon that subject was the evidence of Dunbar, and Colgan, who was a helper in the stable, and who sometimes had assisted Armstrong, the engineer, about the boiler. The evidence of Dunbar was to the effect that Armstrong was a careful man, well acquainted with his duties, who took a great pride in keeping his boiler in good condition, and who spent all his time about the boiler and the engine there and at Corlears street, where also was a boiler and engine of which he had charge. Dunbar testifies that at various times after the inspection in April, 1893, by the hydrostatic test, he saw Armstrong go into the boiler with a hammer, but he does not undertake to say for what purpose he went into the boiler, or what he did after he got there. Colgan testifies that on two occasions (one several months before the explosion, and one three weeks before the explosion) he saw Armstrong go into the boiler for the purpose of cleaning it; that he took with him a lamp; and that he (Colgan), who assisted him, handed him from time to time such other tools as he needed for the purpose of cleaning the boiler, and, among others, he handed him a hammer; and that he heard Armstrong tapping with the hammer inside. That is all the testimony given by either side upon the question whether Armstrong made any tests of the boiler or not. It is quite clear that the burden lay upon the plaintiff of showing that no proper tests were applied, and that, before a verdict could be rendered for the plaintiff, the jury must be able to say that the facts existed from which an inference of the particular act of negligence could be drawn. Cosulich v. Oil Co., 122 N. Y. 118, 25 N. E. 259.

It is quite true, too, that a jury will not be allowed to render a verdict establishing the negligence of a defendant upon a conjecture built upon a bare possibility, but that facts must exist which tend to show the existence of the negligence charged. Pauley v. Lantern Co., 131 N. Y. 90, 29 N. E. 999. It is to be seen whether, applying this rule, the jury would have been justified in finding that there was no sufficient inspection of this boiler by a hammer test, if they concluded that it was the duty of the defendant to use that test.

It appears that the boiler had been seriously weakened by the corrosion which undoubtedly existed. This corrosion had existed for a length of time which must be measured, at least, by months, and the effect of it was to seriously weaken the boiler, and unfit it to bear the strain which the ordinary steam pressure would impose upon it. The jury might have found that the hammer test, properly applied, would indicate that weakness. We must bear in mind that the question is whether the jury might have found that such a test was not applied. They could start in the examination with the facts stated above, and it was for them to say whether, upon the evidence, Armstrong did not make that test, or did not make a proper test. The evidence upon the subject does not tend to show

that Armstrong ever went into that boiler for the purpose of testing it. Dunbar does not know why he went there, and Colgan testifies explicitly that he went there for the purpose of cleaning it; and he says nothing about any test having been made by him. The jury were at liberty to infer from the testimony of Colgan that, when Armstrong went into the boiler, he went there solely for the purpose for which Colgan said he went there, and for no other purpose. The fact that he used the hammer, tapping on the inside, did not necessarily tend to show that he tapped for the purpose of testing the boiler, because it is indicated by the evidence that, in cleaning the boiler, it is necessary or usual to strike the tubes and the stays, to free them from incrustations which are likely to form upon them. It did not necessarily follow, then, from the facts sworn to by Colgan, that Armstrong was inside the boiler to test it; but whether he was there for that purpose or not was an inference to be drawn by the tribunal which must decide upon the facts.

Negligence may be established, as is well known, not only by a determination upon disputed facts, but by inferences to be drawn from established facts; and the question is to be decided by the jury just as much whether they must decide upon the facts, or whether they must conclude upon the inferences which the facts warrant, if there is more than one inference to be drawn. Hart v. Bridge Co., 80 N. Y. 622; Shear. & R. Neg. p. 9, § 541. Clearly, here it was a fair inference from these facts that Armstrong did not go into that boiler for the purpose of inspecting it, and did not inspect it while he was there, and the jury might have found that to be the case. There was no pretense of any other inspection by the use of the hammer, by any other person than Armstrong; and so, if the jury found that Armstrong did not use that means of inspection, it necessarily followed that no such inspection was resorted to, and they might resolve that question, too, in favor of the plaintiff.

There was very considerable evidence bearing upon this question of inspection which has not been referred to in this opinion, but it has all been considered; and, as the result of it, we conclude that the disputed questions with regard to the inspection were properly left to the jury, and their conclusion was sustained by evidence which was given in the case.

The jury, having decided the questions of facts, upon the merits, in the plaintiff's favor, gave him a verdict for $3,000; and one of the grounds upon which the motion for a new trial was based was that the verdict was excessive. It appeared from the testimony that the plaintiff was rendered unconscious by the force of the explosion; that he was taken to the hospital, where he remained two days, when he was taken to his own home. As the immediate result of the injuries he received at that time, there were many bruises upon his body. There were indications of concussion of the brain and the spinal cord, and the loss of power of motion and sensation. His bruises were sensitive and painful, and the pain resulting from them continued for some time. There was also a partial paralysis of his leg for some time. The jury might have found

from the testimony that some of these symptoms existed at the time of the trial. The plaintiff was confined to his bed or a chair for upward of four months, and to his house for six or eight months in all, and did not get back to work until eight months after the accident. At the time of the accident, he was receiving $12.25 a week; so that his total loss of wages was upward of $400. Besides that, he was put to considerable expense for his physician's bills. In addition to the amount he was entitled to receive from these two items, it was the duty of the jury to allow him damages for the pain and suffering he was obliged to endure, and for the diminution of his earning power because of the continuance of the injuries, if they found upon the whole that the effects of the injuries were likely to continue for any length of time after the trial. This they might have found upon the evidence. Taking into consideration all the elements of damage which the jury might conclude to exist, we cannot say that the verdict was excessive. The amount to be allowed in these cases for damages which are purely unliquidated in their nature, such as the compensation for suffering, is so exclusively in the discretion of the jury that it is very rarely that a verdict which is not plainly exorbitant can be set aside. This verdict is liberal, to be sure, but we cannot say, upon consideration of the facts which the jury might conclude to have existed, that the amount is greater than that which they were at liberty to award in the exercise of a fair discretion which is vested in them.

There remain for consideration only the exceptions which were taken to the admission of evidence, and to the charge of the court. Some of these are substantially disposed of by the considerations already stated; but we will examine such of them as appear to us not to have been already necessarily decided as the result of the previous discussion, in the order in which they were presented upon the points by the appellant's counsel.

It is claimed that the court erred in refusing to charge that although there may have been negligence on the part of Armstrong, the engineer, by reason of which the boiler exploded, yet, even in that case, the plaintiff would not be entitled to recover, because Armstrong was the fellow servant of the plaintiff. Under the facts of this case, we think any such charge as that would have been error, and the court was correct in refusing to give it. While the general proposition of law is undoubtedly true, that the plaintiff assumes the risk of negligence on the part of a fellow servant engaged in the same employment, and cannot recover against his employer for damages caused by that negligence, yet it is also true that many acts which a servant is called upon to do in the exercise of his employment he does as the representative of his master; and for any negligence in such matters the master is liable, and as to those acts he is not a co-servant with a fellow employé. It is doubtful whether, upon the evidence, any negligence whatever could have been predicated of Armstrong. If there could not, then there was no reason whatever for requesting the court to charge in regard to it. But, if there was any negligence on the

part of Armstrong, it was only negligence in the inspection of the boiler.    This inspection was a personal duty of the master (Pantzar v. Mining Co., 99 N. Y. 368, 2 N. E. 24); and, in the performance of it, Armstrong acted as the alter ego of his employer.   While he was so engaged, any negligence was the negligence of the employer, of which the plaintiff, as a co-servant, did not take the risk.

One of the witnesses sworn on behalf of the plaintiff was Robert H. Thurston, who was shown to be an expert of great experience in the inspection of iron and boilers.    While he was upon the stand, he was asked whether he could ascertain with reasonable certainty, from the inspection of corroded iron, the length of time it had taken to bring the piece of iron in the boiler to any state of corrosion, to which he answered that he could not tell with precision.    He was then asked whether he could say that the least period within which a piece of iron had become so corroded as this boiler was corroded was to be measured by weeks or by months.    To that question the witness answered that he should say months.    He was then asked upon a hypothetical question, based upon the facts which had been made to appear in relation to this boiler, if he could state with reasonable certainty whether the corrosion must have existed on the 24th of April, 1893, which was the time at which the hydrostatic test was applied.    To this question an objection was taken, upon the ground that it was speculative and conjectural, and other grounds which are not material to be considered here.    The objection was overruled, and the witness answered that, in his judgment, a corrosion existed at that time.    This exception is now relied upon by the defendant as error.    It is quite true that the witness stated, shortly before the question was asked, that he could not fix with precision the time which it would take to corrode iron as this iron was corroded; but he also stated that it would take a considerable length of time, or, as he expressed it, "it would take months"; and he had before that stated upon his examination facts which render it quite certain that he was able, as he said he was, to express an opinion with some certainty, not as to the particular length of time which it had taken to corrode the iron as it was corroded, but as to the time during which this corrosion must have existed, although it did not necessarily follow that it had not existed for a considerable length of time before.    It did not follow, because the expert witness could not precisely fix the time which would be taken to corrode the boiler, that he could not say that at any particular time such a state of corrosion or some corrosion did not exist.    This was plainly the distinction in the mind of the witness, and it is one which is reasonable, and might fairly be supposed to exist; and it was not error to permit him to answer the question when it had been made to appear, as it was by this testimony, that he could answer it with considerable approach to accuracy.

The witness Duston, who was also shown to be an expert inspector of boilers, and accustomed to examine iron for the purpose of ascertaining its condition, was also asked by the court if he was

able to state the least time it must have taken to produce the corrosion exhibited upon that plate under any circumstances, upon which he answered that he was.   He was then asked by the plaintiff's counsel to state it, and the answer was that it would have taken from a year to two years; and he was then asked whether, upon a certain state of facts, which were put in the shape of a hypothetical question, he could say that the corrosion must have existed on the 24th of April, 1893, to which he replied that it did, in his opinion.   This question was also objected to; but the opinion was clearly one which an expert witness might be permitted to express, and the objection to it was properly overruled.

In the course of the trial, the plaintiff offered in evidence certain rules of the sanitary bureau of the police department, regulating the manner of investigating the qualifications of persons who were candidates for certificates as engineers, and prescribing the rights of persons who had received a certificate of qualification.   Strenuous objection was made to the admission of these rules by the defendant's counsel, and it is now urged that they were not material, and ought to have been excluded.   It appeared upon the testimony that the certificate which had been given to Armstrong, the engineer, authorized him simply to take charge of and operate a steam boiler at Corlears street, and contained nothing as to authority to operate the boiler in question.   Nevertheless, it was conceded that Armstrong, without any other certificate than this one, operated both boilers.   The rules in question prescribe the manner of examination for the qualification of engineers, and the form of the certificate to be given, and contained a statement that the certificate thus given authorized the engineer by whom it was received to take charge of and operate a boiler mentioned in the certificate, and no other.   It was said that this provision of the rules was beyond the power of the police department, and imposed a limitation upon their certificate which the statute did not authorize, and for that reason it was error to admit the rules in evidence, and this error was prejudicial to the defendant.   We do not think it is necessary to consider this point, because the court, at the request of the defendant's counsel, charged the jury that, Armstrong having been licensed after examination to operate steam boilers in the city of New York, it was not negligence on his part to operate, or on the part of the defendant to employ him to operate, the boiler on Fourteenth street, as well as on Corlears street, which was the one mentioned in his certificate.   If there had been any error in admitting those rules, for the reasons mentioned by the defendant's counsel, or any other reason, it is quite clear that the charge of the court, given to the jury at the request of the defendant's counsel, eliminated any question of negligence on the part of the defendant by employing Armstrong to operate another boiler than the one mentioned in his certificate; and, if there were error, no harm could be done.   Assuming, although we do not decide, that this evidence was irrelevant, it is not every case of the admission of irrelevant evidence which will require the reversal of a judg-

ment.   Where the evidence does not excite the passions and prejudices of the jurors, but is practically colorless in its nature, and only harmful for the reason that the fact proven by it is entirely immaterial, or that it is not available to prove a material fact, a direction by the judge to disregard the evidence, or a direction by the judge that the fact proved by it is of no importance, and that that fact must be disregarded, cures the error, if there is any. When, therefore, the jury were told that it was not negligence on the part of the defendant to permit Armstrong to operate this boiler on Fourteenth street, it is plain that no harm resulted to the defendant from the admission of these rules, which prescribed that he should operate no other boiler than the one mentioned in his certificate.

The defendant put upon the stand, as an expert, Dr. Charles E. Emery, who gave material evidence upon the various points in the case.   During his cross-examination, his attention was called to certain books on the design, construction, and operation of boilers, —one written by Charles A. Smith, and another by Prof. Thurston, who was one of the plaintiff's experts,—to which he answered that he knew of those books, and that they were standard works on engineering subjects.   Dr. Emery had testified that, in his judgment, the hydrostatic test was very effective; and that the hammer test was, in his judgment, inefficient and insufficient.   In view of that testimony, certain passages from the two books above mentioned, as to the efficiency of the hammer test, were read to him, and he was asked whether or not he agreed with what was stated in those passages.   This testimony was objected to as immaterial, and, the objection having been overruled, an exception was taken. We are quite clear that this evidence was entirely competent. There is no doubt that the contents of scientific books cannot be read to a jury for the purpose of proving the facts or establishing the deductions stated in them.   The reasons for this rule are so thoroughly stated in the text-books that it is not here necessary to comment upon it.   But the contents of the books which are referred to in this particular case did not come within that rule. Whenever a man holds himself out as an expert witness, and undertakes to give his opinion upon any scientific matter, it is not only proper to examine him as to the ground of his opinion, but his qualifications as an expert may be tested upon cross-examination in any way which will enable the jury, who are to pass upon the weight to be given to his testimony, to judge intelligently about it.   For that purpose, it is perfectly proper to ask him whether or not the opinion he has expressed agrees with the opinion of other people who are conceded to be learned upon the same subject, because, if an expert witness admitted that the opinion which he expressed was contrary to the opinion which was held upon the same subject by other men who were acquainted with the same science, it might, unless the reasons which he gave for his opinion were satisfactory, tend strongly to detract from the weight which that opinion would otherwise receive.   For the same rea-

son, if the witness admitted that text writers of acknowledged authority had expressed opinions contrary to that one which he gave in regard to the matter under examination, that might go to detract from the weight to be given to such testimony. Therefore it has been the custom, in this state at least, to call the attention of expert witnesses, upon cross-examination, to books upon the subject, and ask whether or not authors whom he admitted to be good authority had not expressed opinions different from that which was given by him upon the stand. The reference to books in such cases is not made for the purpose of making the statements in the books evidence before a jury, but solely for the purpose of ascertaining the weight to be given to the testimony of the witness. The extent to which such examinations may go is very largely in the discretion of the court. It has been usual to permit questions of that kind to be asked in this state, and we are not aware of any well-founded objection to it. For this reason, we think that the objection to this kind of testimony was properly overruled.

The court was asked to charge substantially that, the legislature having prescribed that every steam boiler in the city of New York should be annually tested by hydrostatic and atmospheric pressure, and such test having been made as prescribed by the statute, the defendant had a right to rely upon such official inspection and test; and that, in the absence of any notice, information, or suspicion of any defect in the boiler, ordinary care did not require the defendant to subject the boiler to any other or additional test. This request was denied by the court, and the defendant excepted. We are of opinion that, in this refusal to charge, the court was sustained by the authorities. In the case of Caldwell v. Steamboat Co., 47 N. Y. 282, which was an action for damages for injuries received by the plaintiff on account of the explosion of a boiler used upon the defendant's steamboat, it was made to appear that the defendant had complied in all respects with an act of congress requiring certain inspections to be had of steam boilers; and the court was asked to charge that, the defendant having complied in all respects with that act, there was no further presumption of neglect against it, and it was not liable. This the court refused to do. The court of appeals held that the refusal to charge was not error. It was said that while the act of congress provided additional safeguards for the protection of passengers to those formerly imposed by law, and a failure to comply with the provision would have subjected the defendant to the charge of negligence, the duty of the defendant did not arise out of the statute, but was a common-law duty; and that the mere fact that the statute had been complied with did not necessarily establish that the defendant had performed its common-law duty. The case was followed, and the same rule laid down, in the case of Swarthout v. Steamboat Co., 48 N. Y. 209. Under the authority of these cases, the charge requested was properly refused.

The plaintiff's counsel requested the court to charge as follows:

"The inspection of the boiler was the duty of the defendant. Had such duty been carelessly or negligently performed, even by a competent inspector, the master would still be liable. To excuse him from liability, the boiler must have been inspected by a competent inspector, and at reasonably frequent intervals."

To this charge, given at the request of the plaintiff's counsel, the defendant excepted. The charge, we think, was directly within the rule laid down in the cases of Fuller v. Jewett, 80 N. Y. 46, and Durkin v. Sharp, 88 N. Y. 225. The defendant cites, to establish the incorrectness of the charge, the case of Murphy v. Railroad Co., 88 N. Y. 146. In that case a locomotive of the defendant was in the repair shop. It had been partly repaired; and one of the mechanics, having, as it was supposed, finished the work which was to be done by him, turned it over to the plaintiff's intestate, to have the repairs completed. While the plaintiff's intestate was at work upon the locomotive, it exploded, and he was killed. It was found upon examination that the defects which caused the explosion were those which ought to have been remedied by the mechanic who first took the locomotive for repairs, but had not. It was held, however, that this negligence was the negligence of a co-servant, for which the defendant was not liable. It appeared in the case that the boiler maker who undertook to make the repairs which were first necessary was a competent and proper person for that purpose; that both he and the plaintiff's intestate were employed in the same shop; and that the work was not finished at the time of the explosion. But the court held that the fact that the locomotive was at that time in the repair shop was evidence that it was not yet fit for the purpose for which it was intended, and that it was not in a safe condition; that when it was sent to the repair shop, and the work of repair upon it assumed by the mechanics in that shop, it must have been understood by all of them that they were at work upon an unsafe machine, for the purpose of making it safe; that there could be no presumption in such a case that the master had made the machine safe for the purpose for which it was intended, because the fact that it was in the repair shop was conclusive proof that it was not safe; and that those persons who were working together in the repair shop to mend an unsafe machine must be deemed to have notice of these facts, and to assume the risks which were necessarily taken by a man who was employed upon a machine which he knew to be unsafe. The case of Fuller v. Jewett, supra, was distinguished. The facts in the case at bar do not bring it within any of the rules laid down in the Murphy Case, but it is clearly within the decision of the court of appeals in the case of Fuller v. Jewett; and, within the rule of that case, the charge was correct.

We have examined the other exceptions taken by the defendant upon the trial. Many of them are already disposed of by what has been said, and, as to the others, we do not think that they are well taken. The judgment must therefore be affirmed, with costs. All concur.