### CISCO & N. E. RY. CO. et al. v. PROCTOR et al (No. 10851.)*

(Court of Civil Appeals of Texas. Fort Worth. Nov. 15, 1924. Rehearing Granted Jan. 24, 1925. Appellees' Motion Overruled March 7, 1925.)

1. Carriers ⊂⇒316(1)—Burden on plaintiffs to show contract imposing liability on initial carrier.

In action for passenger's death, burden was on plaintiffs, in view of Vernon's Sayles' Ann. Civ. St. 1914, arts. 731 et seq. and 6608 et seq., to show that, by contract between carriers, initial carrier remained liable, after turning car over to connecting carrier, for injuries caused by negligence in permitting car to become cold.

2. Carriers ⊂⇒318(12)—Evidence held insufficient to show that initial carrier was liable for injury after turning its coach over to connecting carrier.

In action for death of passenger alleged to have been caused by carrier's negligence in permitting car to become cold, evidence *held* insufficient to show that, by contract between carriers, initial carrier was liable for injuries after it had turned car over to connecting carrier.

3. Carriers ⊂⇒321(3)—Charge on carrier's duty to protect passengers held not subject to criticism that it made carrier insurer.

Charge that carrier must use such high degree of care and foresight to protect passengers from danger, and exercise such high degree of prudence as would be used by cautious or prudent and competent person under same circumstances, and failure to exercise such care was negligence, *held* not objectionable as making carrier an insurer.

4. Appeal and error ⊂⇒1064(4)—Charge on contributory negligence, inadvertently referring to decedent as plaintiff, held not reversible error.

Charge on contributory negligence, which inadvertently used term "plaintiff" for "decedent" *held* not reversible error.

5. Evidence ⊂⇒558(11)—Permitting cross-examination of expert as to medical books held without error.

To test capacity of experts, it was not error to permit cross-examination as to whether certain medical books on subject of pneumonia were not standard, and whether they did not

---

show period of incubation was within time contended for by plaintiff.

**6. New trial ⬤═8—Granting new trial discretionary.**

Granting of new trial is largely within discretion of trial court.

**7. Death ⬤═99(4)—$12,000 for death of bricklayer aged 42 years held not excessive.**

$12,000 for death of bricklayer 42 years of age and capable of earning $11 per day when he worked *held* not excessive.

**8. Appeal and error ⬤═1004(1)—Only when jury abuses discretion will damages be set aside as excessive.**

Question of amount of damages for death being peculiarly within jury's province, it is only when jury have abused their discretion that their action will be set aside on ground of excessiveness.

On Appellants' Motion for Rehearing.

**9. Trial ⬤═122—Argument of plaintiffs' counsel held reversible error.**

In action for death of passenger, alleged to have been caused by carrier's failure to keep car warm, argument of plaintiffs' counsel that reason why defendants did not call other passengers as witnesses was that their testimony would be the same as plaintiffs' *held* reversible error.

**10. Trial ⬤═352(1)—Special issues held to assume disputed fact and indicate effect of affirmative answer.**

In action for death of passenger, alleged to have been caused by carrier's failure to keep car warm, special issues *held* improper as assuming that car became cold, on which evidence conflicted, and indicating that affirmative answer would warrant judgment for plaintiff.

**11. Trial ⬤═350(6)—Issues as to whether decedent was in good health at time he became passenger held material.**

In action for death of passenger, alleged to have been caused by carrier's negligence in permitting car to become cold, where defendants' evidence showed that decedent, for several days prior to his trip, suffered from a cold, or had influenza or pneumonia, special issue as to his health at original point of entraining or at junction should have been submitted.

Buck, J., dissenting in-part.

Appeal from District Court, Stephens County; C. O. Hamlin, Judge.

Action by Mrs. Emma Proctor and others against the Cisco & Northeastern Railway Company and another. Judgment for plaintiffs and both defendants appeal. Appeals consolidated. Reversed as to the defendant named, and remanded, on rehearing. Reversed and rendered as to defendant Texas & Pacific Railway Company.

Butts & Wright, of Cisco, Hickman & Bateman, of Breckenridge, and H. C. Shropshire, of Weatherford, for appellants.

W. C. Jackson, of Guion, W. A. Shields, of Houston, Evans & Evans, of Greenville, and Chas. L. Black, of Austin, for appellees.

BUCK, J. This is an action instituted by Mrs. Emma Proctor in her own behalf, and as next friend of her six minor children, and for the benefit of W. T. Proctor, plaintiff's stepson and the son of the deceased, and for the benefit of Mrs. Leona Brown, wife of John Brown, and daughter of the deceased against the receivers of the Texas & Pacific Railway Company and the Cisco & Northeastern Railway Company, for damages on account of the death of J. E. Proctor, husband of Mrs. Emma Proctor and father of the other plaintiffs.

It was alleged in plaintiffs' petition that said J. E. Proctor on, to wit, the 9th day of January, 1923, purchased at Strawn a ticket to Breckenridge, entitling him to be carried to Cisco over the Texas & Pacific Railway, and from Cisco to Breckenridge over the Cisco & Northeastern Railway; that said ticket was a through ticket, entitling its purchaser to transportation over both lines; and that said two railway companies were operating and acting together in the operation of said trains and in the sale of said ticket. It was further alleged that, after the train reached Cisco, and before it left for Breckenridge, the car in which the deceased was riding, together with other cars, was permitted to become cold and disagreeable, by reason of being detached from the engine, which condition continued during all the time that said train stayed at Cisco, a period of some two hours or more, and until said car had practically reached Breckenridge; that said condition of said car existed until long after said car had reached Stephens county, in which Breckenridge is situated; that at said time, to wit, from about 2 o'clock a. m. until said train left Cisco, and until the same reached Breckenridge, the weather was cold, damp, and disagreeable, and the interior of the car in which the deceased was a passenger was permitted to become cold and disagreeable, and to so remain during all of said time; that the agents and servants of both defendants were guilty of negligence in permitting the said coach to so become cold and disagreeable, and in failing to keep the same warm to such an extent as to be comfortable for passengers riding therein. It was further alleged that said J. E. Proctor, as a result of such negligence, caught cold and contracted la grippe, influenza, and pneumonia, which resulted in his death on the 19th day of January, 1923.

Upon a trial, the cause was submitted to a jury on special issues, in answer to which the jury found: (1) That the car in which the deceased was a passenger at the time in question became cold and disagreeable; (2)

that the agents and servants in charge of said car permitted it to become cold, and were guilty of negligence in so doing; (3) that the deceased contracted or took cold on account of the cold condition of the car, and that the cold condition of the car was the proximate cause of deceased's contracting or taking cold; (4) that pneumonia set in as a result of the deceased taking cold in said car; (5) that the power of resistance of the deceased was so lowered or weakened from the exposure to cold in the car as that pneumonia proximately resulted therefrom; (6) that the jury found damages for plaintiffs and assessed the damages as follows: To Mrs. E. P. Proctor, widow, $6,000, to Raymond Proctor, $1,000, to Herman Proctor, $1,000, to Harvey Proctor, $1,000, to Dessie May Proctor, $1,000, to Electra Jaunita Proctor, $1,000. Upon instructions of the trial court, the jury found that W. T. Proctor, the adult son, and Mrs. Leona Brown, a married daughter, were entitled to no damages. Upon this verdict, the court entered judgment in accordance therewith in favor of Mrs. Proctor and her six minor children, against both defendants, jointly and severally, though the judgment is against only one of the defendants, the Cisco & Northeastern Railway Company by name. The jury further found against the defendants on their plea of contributory negligence, in deceased's failing to leave the coach in which he was and go to a fire in the depot at Cisco.

Both defendants have appealed, and the two causes have been consolidated, on motion, in this court, and will be treated as one appeal.

Both defendants asked for a peremptory instruction, and we will first consider whether such instruction was proper as to either or both of them. The evidence shows that part of the journey from Strawn to Cisco was over the Texas & Pacific Railway line, hereinafter called T. & P. Company, and that, when the train reached Cisco, the T. & P. engine was taken off and the C. & N. E. engine was attached to the train. These facts are proven by the testimony of D. L. Langston, a brakeman of the C. & N. E. Company, and are uncontracted. He testified:

"It took possibly 10 minutes to make that change. As far as I know, the condition of the Cisco & Northeastern engine was all right at that time as to fire and steam, but I am not an engineer. The engine was coupled onto the train. The length of time the train stands at the depot with the C. & N. E. engine attached to it varies, and depends on the amount of express and baggage to unload. I don't recollect how long it stayed there on the morning of the 9th, but it leaves as soon as the passengers and express baggage are unloaded. After attaching the C. & N. E. engine, the Cisco & N. E. crew took charge of the train. The T. & P. crew and engine did not have anything to do with the train after they were relieved by the C. & N. E. crew at the Cisco station. After the C. & N. E. crew took charge the train pulled out in the yards possibly a quarter of a mile from the depot at Cisco. Then we carried the train to the "y" and turned it around. Then we took it down to the main line and remained there until we backed down to the station. We backed down to the union station in the neighborhood of 5 o'clock on the morning of the 9th. I cannot positively say that the engine was not uncoupled from the train after it left the depot and before it was backed down to the union station."

There is no complaint that the car in which deceased was riding was not warm and comfortable up to the time it reached Cisco. Therefore, unless the T. & P. Company is liable by reason of an assumed duty to transport the deceased from Strawn to Cisco over its own line and from Cisco to Breckenridge over the line of the C. & N. E. Company, it does not appear that it or its agents and employés were guilty of negligence, and that it is liable for damages in this case.

The ticket sold to the deceased in this case was evidently a coupon ticket, the T. & P. Company coupon being good for transportation from Strawn to Cisco, and the C. & N. E. Company's coupon being good for transportation from Cisco to Beckenridge. The ticket has this provision:

"In selling this ticket, the selling carrier acts only as agent and is not responsible beyond its own line."

The evidence shows that the conductor of the T. & P. Company took up that part of the ticket from Strawn to Cisco, and the conductor for the C. & N. E. Company took up that part providing transportation from Cisco to Breckenridge. O. Marshall, witness for defendants, testified:

"My name is O. Marshall, and I am train master for the Texas & Pacific Railway Company. I held the same position on the morning of January 9th and night of January 8th of this year. I have a record of train No. 11 from Fort Worth to Cisco on the night of January 8th. It left Fort Worth at 9 o'clock and reached Cisco at 2:10 a. m. When the train reached Cisco, it was delivered to the Cisco & Northeastern Railway Company. None of the Cisco & Northeastern agents, servants or employés had any connection, direction, or control over this train between Fort Worth and Cisco, and the Cisco & Northeastern did not have any interest in or participate in any part of the revenues derived from the train between Fort Worth and Cisco. After the train was delivered to the Cisco and Northeastern at Cisco, none of the agents, servants, or employés of the Texas, & Pacific had any connection with, direction, control, or management of the train whatever. The receivers of the Texas & Pacific, or any of its officers, servants, or employés, did not participate in any way or to any extent whatever in any revenue derived by the Cisco & Northeastern in operating the train after it left our hands."

On cross-examination he testified:

"I have never seen the contract between the Cisco & Northeastern and the Texas & Pacific with reference to this through train being run, and don't know what that contract provides. I don't know whether this train is called the Oil Field Special or anything particularly. If it is called the Oil Field Special in the Texas & Pacific folders, you will have to show me. You ask if it is not true they do run a through train, no matter what it is called. The Texas & Pacific runs the train from Fort Worth to Cisco and that equipment is run over the Cisco & Northeastern railroad. It is Texas & Pacific equipment and, when a ticket is called for or sold at Fort Worth to Breckenridge, the passenger rides the same car on in to Breckenridge. That equipment belongs to the Texas & Pacific. You ask if this arrangement does not make it mutually beneficial to both the Texas & Pacific and Cisco & Northeastern. Well, it makes it more desirable to the public to travel, but can't say whether it would be calculated to get more passengers. Through sleepers are run from Fort Worth clear into Breckenridge, and there is also one day coach and one chair car that run from Fort Worth clear into Breckenridge. I think they advertise that in the Texas & Pacific advertising. At that time Breckenridge was a busy oil center and lots of people were coming here. * * * I know the Texas & Pacific does not get any part of the profits between Cisco and Breckenridge, but the division is handled in Dallas. You ask if I have not seen the contract, how I know. I have instructions on that from the passenger office. I do not divide the earnings between the two roads, but have to have that information to be prepared to answer questions like that to the public. I don't exactly know anything about the arrangements of the contract between the two roads; that is, as to the particulars of it, only that we deliver this train at Cisco and are through with it. All I know about how the money is divided is that each road gets its pro rata of the mileage. That is a general thing, and I know the money is divided on a mileage basis, but don't know how much we get or what the pro rata is of the Cisco & Northeastern, say from Strawn to Breckenridge. While I have never seen the contract, I am sure the money is divided on a mileage basis on this particular train, I know that is the arrangement. They have a contract of some kind. I suppose they would have to have that. * * * When the Texas & Pacific sells a ticket from Strawn to Breckenridge, all they would get would be the mileage from Strawn to Cisco and the Cisco & Northeastern would get the mileage from Cisco to Breckenridge."

So far as we have been able to determine, this is the only testimony in the record as to any contract or arrangement between the two railway companies as to the train, from Strawn to Breckenridge, or as to any obligation or duty on the part of the T. & P to assume responsibility to passengers on said run, after they leave Cisco, or after the C. & N. E. takes charge of a train.

[1] Article 6608 et seq. V. S. Statutes 1914, provides as to the duties of connecting carriers for the handling of freight or passengers, but nothing is said in these statutes with reference to any duty imposed on the initial carrier to assume liability for any injury to passengers after they leave the initial carrier's line. Article 731 et seq. provides for the duty of common carriers, over whose lines freight, baggage, or other property is shipped, to assume liability for any damages or injury, or damage for loss or delay of such freight, baggage, or other property sustained anywhere in such through transportation over such connecting lines. But such provision as to passenger trains is not found in the statutes.

In Harris v. Howe, Receiver, 74 Tex. 534, 12 S. W. 224, 5 L. R. A. 777, 15 Am. St. Rep. 862, the Supreme Court said, quoting from Hutchinson on Carriers:

" 'It is universally conceded that he may bind himself by an express contract to carry to any distance or to any destination, whether the carriage can be accomplished by his own means of conveyance upon his own route, or will require the employment of agents or subsidiary carriers beyond it. In this respect he may bind himself to the same extent as other contracting parties, even to the performance of impossibilities, if he will.' "

The court further says:

"The obligation to convey passengers over its own line, not only exists as a public duty independently of any contract to do so, but, from considerations of public policy, it cannot even be modified by contract so as to exempt the carrier from the duty to protect the passenger from consequences of the negligence of its agents and servants. G., C. & S. F. Ry. v. John McGown, 65 Tex. 640. Beyond its own line a different rule in some respects prevails. It is only because the carrier has voluntarily contracted to do so that it can be required to transport a passenger over any other line than its own line, and it results that, like other contracting parties, it may define the terms and limit the extent of its undertaking over other lines, insomuch as may be required to leave upon them the responsibilities of their own negligence. * * * Pennsylvania Central Railroad Company v. Schwarzenberger, 45 Pa. 208. * * * It is equally clear in the case before us that the defendant's liability for negligence was by the express terms of the contract confined to its own line, and that it made the contract for the transportation of the passenger over the line where the alleged wrong was committed only as the agent of the corporation operating such line; and we conclude that, not being bound by its charter as a public carrier, or by contract, express or implied, to transport plaintiff over the Illinois Central Railroad, the defendant was not liable in this action and the court properly so charged the jury."

See 4 R. C. L. § 15, p. 552, and section 582, p. 736 et seq.; 5 R. C. L. § 780, p. 154 et seq.; Barrett v. Market Street R. Co., 81 Cal. 296, 22 P. 859, 6 L. R. A. 336, 15 Am. St. Rep. 62; 5 L. R. A. 777; G., H. & S. A. Ry. v. Wiseman (Tex. Civ. App.) 136 S. W. 793, writ of error denied.

The appellee urges that, inasmuch as the T. & P. sold the ticket providing for the

transportation of the deceased from Cisco to Breckenridge over the line of C. & N. E., but failed to provide that it did not assume the duty of caring for deceased as a passenger while he remained on the through train some hours at Cisco, and the contract of transportation did not disclose who would be responsible for damages occurring while the train was at Cisco, the initial carrier is liable for such damages. They cite the case of Boyles v. McClure, 243 S. W. 1080, by the Commission of Appeals, and approved by the Supreme Court, in support of this contention, but, after carefully examining this decision, we have concluded that its holding is not pertinent to the question here presented. It is true that, under the rule that an agent makes himself liable if he contracts in his own name without disclosing his principal's name, even though the person. contracting with him knew at the time that he was acting as agent only, where a .carrier sells a through ticket containing a coupon for transfer from its depot to that of a connecting carrier, but such coupon does not designate the bus line to make the transfer, the initial carrier is responsible for the injury to passengers resulting from the negligence of the bus line actually making the transfer. The court found that the initial carrier in the cited case was being operated at the time by the receiver of the defendant company, and hence that said defendant company was liable for any injury through the negligence of those in charge of such bus line.

[1, 2] It evidently was the duty of plaintiff, having the burden of proof, to show that, by reason of a contract between the T. & P. and C. & N. E., the first-named company was liable for any injuries or damages occurring after it had turned the car in which deceased was riding over to the C. & N. E. Company. We do not think that the plaintiffs have shown this and conclude that the trial court should have instructed a verdict for the defendant, the receiver of the T. & P. Company; but we do not find that such an instruction should have been given as to the defendant C. & N. E. Company.

[3] The C. & N. E. Company, hereinafter called appellant, urges error in the charge of the trial court that—

"It is the duty of railway companies engaged in the transportation of passengers to use such a high degree of care and foresight in protecting its passengers from possible danger, and to exercise such a high degree of prudence in guarding against them as would be used by a cautious or prudent and competent person under the same or similar circumstances, and a failure to exercise such care is negligence."

It is urged that this charge imposed a higher degree of · care on the defendants than the law imposes, in that it made the carriers the insurers of their passengers' lives or against all possible danger. We do not believe that said charge is subject to the criticism made. It might have been framed differently, but we believe that it, in effect, informs the jury of the character of diligence imposed upon a carrier of passengers. Ry. Co. v. Halloren, 53 Tex. 46, 53 (37 Am. Rep. 744) says:

"A passenger on a railway train has, by reason of the risk naturally incident to this mode of travel, the right to demand of the company for his safe passage that high degree of care and skill which very cautious persons generally, in their line of 'business, are accustomed to use, under similar circumstances, to prevent danger."

If the word "that," used in the quotation given, had been used for "such" in the charge, they would have been substantially the same. It is true that carriers are not insurers of the lives of their passengers, but we do not believe the charge imposes upon the defendants such duty of insuring the lives of their passengers. The assignment is overruled.

[4] Error is urged also in the charge of the court on contributory negligence, wherein the court charged that by "contributory negligence," as that term was used in the charge, was meant "such an act or omission on the part of the *plaintiff* amounting to want of ordinary care of prudence," etc. (Italics ours). We do not believe that the use of the word "plaintiff" instead of the word "deceased" could have misled the jury. The charge submitted by the appellant on the question of contributory negligence uses the word "plaintiff" instead of "deceased" and is substantially the same as that given by the court. We think the jury understood that the court intended to refer to the deceased instead of to the plaintiff, and that no reversible error is shown.

Assignments 4, 5, 6, 7, and 8 are grouped for treatment in appellant's brief, and complain of the form of submission of the issues to wit:

"No. 3. Was such servant or servants in charge of said car that permitted it to become cold guilty of negligence as that term is defined in the first paragraph of this charge?

"No. 4. Did the deceased, J. E. Proctor, contract or take cold on account of the cold condition of the car?

"No. 4a. Was the cold condition of the car, if it was, the proximate cause of the deceased contracting or taking cold?

"No. 5. Did pneumonia set up as the proximate result of his taking cold in said car or coach?

"No. 6. Was the power of resistance of the deceased so lowered or weakened by exposure to cold in the car as that pneumonia later proximately resulted therefrom?"

It is urged that all of these issues are leading and suggestive to the jury of the answers expected to be made in answer to them, and invade the province of the jury in depriving them of the right to pass upon the. issues of fact involved in the case. Especially

as to issue No. 6 it is urged that such issue was not supported by any pleading of plaintiffs, and, therefore, its submission was error.

Plaintiffs alleged that the deceased, while in the car at Cisco, and while waiting there, took cold in his limbs, body, and person, and contracted a severe cold, la grippe, influenza, and pneumonia, which finally resulted in or developed into pneumonia and caused his death. Dr. C. D. Cupp, while testifying for defendant, testified that influenza and pneumonia developed from cold contracted and that he could not say how long after the person took cold before pneumonia or influenza would develop, but that in his opinion and from his experience he would say that the time required was from a few hours to several days. He further testified that the exposure described to him by counsel as having occurred while the deceased was in the car at Cisco "would be calculated to lower the resistance of the body so as to furnish a vital field for the germs to go to work, as exposure is a cause of all colds." We believe that the allegation that deceased contracted a cold while in the car at Cisco, and that the cold really developed into pneumonia, is a sufficient predicate for the introduction of the testimony of this witness along the lines above quoted, and that the testimony perhaps authorizes an inquiry of the jury as to whether the deceased did die of pneumonia directly resulting from the cold contracted while on the appellant's train. It may be said that the question propounded in issue No. 6, and perhaps in some of the other questions above quoted, was evidentiary of the main facts sought to be proven, to wit, that the deceased died of a cold contracted while he was in the car at Cisco, and that such questions should not have been submitted, yet we do not see that any injury has been suffered by appellant by reason of the submission of the questions in the form they were made, or the answers of the jury thereto. It has been frequently held that the parties to a suit, submitted on special issues or under a general charge, have the right to have submitted to the jury a group of facts upon which such party or parties rely for a judgment. It is, at least, the opinion of the majority that no more than this is shown to have been done in the instant case, and that no reversible error is shown.

The ninth and tenth propositions complain of the failure of the trial court to submit two submitted issues inquiring as to whether the deceased was suffering from a cold, influenza, or pneumonia at the time he started on his journey from Strawn to Breckenridge, and as to whether he was in good health and strong at said time. It is true that plaintiffs below pleaded that deceased was in good health at the time of boarding the train, and was not suffering from cold,

la grippe, or pneumonia. This, however, was an unnecessary allegation and the burden of proof on the part of plaintiffs was not increased by this unnecessary averment. I. & G. N. Ry. v. Harris, 95 Tex. 347, 67 S. W. 315. The duty of the railway company to keep its cars reasonably warm and comfortable while at Cisco, and while en route, was the same whether its passengers were strong and healthy or were suffering from a cold. Even though the deceased was catchcold at or about the time he left home, about midnight of January 8th, as the defendant's testimony tends to show, and the plaintiff's testimony tends to show the contrary, yet the defendant would have been liable for any negligence in keeping the car reasonably warm and comfortable, so as to prevent its passengers from taking cold, or to prevent those already taking cold from taking more cold and becoming worse. Hence we do not believe that the failure to submit these issues, however proper their submission would have been, presents reversible error. The same ruling as to the action of the trial court in failing to submit to the jury the question of whether "the car in which J. E. Proctor, deceased, was riding from Strawn to Beckenridge was kept at such degree of warmth as was essential to a person in good health and strong," is applicable.

W. T. Proctor testified that he and his father went from Strawn to Breckenridge together; that his father was dressed in a pair of trousers, a heavy pair of union suits, a coat and a pair of blue ducking overalls; that the wind was blowing from the north the night of the trip; that the coach they went in at Strawn was comfortable and warm; that, after the train was backed down on the "Y" at Cisco, the engine was detached therefrom and the coach began to get cold; that there was no steam; that, after they were set out on the "Y," the atmosphere began to change, and it began to get colder, and the coach began to get cold; that he asked the brakeman as to why the coach was getting cold and the brakeman told him that the engine was down at the roundhouse, he supposed; that his father began to complain of suffering from cold; that he said his feet were getting cold and he had a rigor and was shaking, and that he suffered with the rigor until the train got to Breckenridge, where he went to bed; that the weather was cold that night, and was freezing from about 3 o'clock to about 5, at least it was pretty near freezing.

The jury found in answers to issues submitted that the car in which the deceased was a passenger while at Cisco became cold and disagreeable and that the agents and servants in charge of said car permitted it to become cold, and were guilty of negligence in so permitting, and that the deceased contracted or took cold on account of the cold condition of the car, and such cold condition

of the car was the proximate cause of the deceased contracting or taking cold. Even though the plaintiffs alleged unnecessarily that the deceased was strong and well at the time he started on the trip, such allegation did not impose a greater burden on the plaintiffs to prove that he was strong and well at said time, or impose any less duty on the part of appellant to exercise that high degree of care required of carriers of passengers to protect them from injury.

[5] Complaint is made in the twelfth proposition that the trial court erred in permitting counsel for appellee while cross-examining the doctors who were used as expert witnesses, and, over the objection of appellant, to interrogate the witnesses and to get before the jury the opinions expressed in certain medical books. It is urged that this was prejudicial to the rights of appellant; that the law will not permit a litigant to introduce evidence indirectly which is prohibited by law from being introduced directly. On cross-examination of the doctors introduced by appellant, counsel for plaintiffs was permitted to interrogate them with reference to the time required after a patient catches cold to mature and incubate the pneumonia or influenza germs, in an effort to show that such period of incubation was from a few hours to several days, and to test the capacity of such witnesses to testify as to the matter inquired about, and asked the witnesses as to whether certain medical books upon the subject were standard authority, and whether such books did not show that the period of incubation was within the time contended for by plaintiffs. The case of G. C. & S. F. Ry. v. Farmer, by the Court of Civil Appeals, 108 S. W. 729, held that medical books are not admissible in evidence to prove the opinion therein, nor may the opinions contained therein be presented to the jury by quoting from the books and having a medical witness testify as to whether he agrees with them, and, if not, in what respect he differs from them; that such testimony is hearsay. This case was appealed to the Supreme Court, and in 102 Tex. 235, 115 S. W. 260, in an opinion by Chief Justice Gaines, the Supreme Court held:

"The purpose of the testimony sought to be elicited is to test the knowledge of the so-called expert and to determine the weight of his testimony, and it seems to us that no better way could be devised for doing this than to take the accepted authorities upon the subject and to see how his knowledge of the matter corresponds with that of such authorities. The following cases seem to recognize the propriety of the question: Hess v. Lowrey, 122 Ind. 225; Egan v. Dry Dock R. R. Co., 12 App. Div. 556; City of Ripon v. Bittel, 30 Wis. 614; City of Bloomington v. Shrock, 110 Ill. 219; Hutchison v. State, 19 Neb. 262; Pinney v. Cahill, 48 Mich. 584. In such a case we think the testimony should be confined to the purpose of a cross-examination; that is, of showing such deficiency in the knowledge of the expert as to the science about which he is testifying as is calculated to impair the weight of his testimony before the jury. In our opinion, it is but just to the witness to state the name of the author of the book by which his proficiency is sought to be tested. At all events we have found no case which holds that the name should not be given."

See Scullin v. Vining, by the Supreme Court of Arkansas, 127 Ark. 124, 191 S. W. 924; Osborn v. Cary, by the Supreme Court of Idaho, 28 Idaho, 89, 152 P. 473; Greenleaf on Evidence (15th Ed.) § 450, p. 579; Underhill on Evidence, § 189; 3 Jones on Evidence, § 573, p. 245. The assignment is overruled.

Assignments 13 and 14 complain of an alleged improper argument by counsel for plaintiff. Mr. Shields, one of counsel for plaintiff, argued that, if they could find the identical tickets sold to Proctor and son, there was no reason why they could not find other tickets sold to other men on the train and have those men testify. He argued that the reason they did not have them testify was because such men would not testify contrary to the testimony of W. T. Proctor. He further argued that W. T. Proctor had no opportunity to find these men because such tickets were not in his possession and he was not investigating this case and did not talk about it four days after, as the evidence shows was done by one or more of the employés of defendant. We do not find any reversible error in this argument, nor in the argument by Mr. Evans; also of counsel for plaintiff. While we think the argument of Mr. Evans was perhaps calculated to arouse the sympathy of the jury, yet we further hold that such argument cannot be held to be reversible error, unless there is presented a serious question as to the excessiveness of the verdict. As is hereafter shown, we do not think the verdict can be held excessive.

We do not find any reversible error in the failure of the court to grant a new trial by reason of the testimony desired of J. S. Crouch and J. C. Bridges. Mr. Bridges made an affidavit that during the latter part of December, 1922, J. E. Proctor was employed by Bridges and Lacy, and that on December 29th deceased went to affiant and told him that he (deceased) was sick and suffering from a cold; that at this time the eyes of deceased were watery and his nose running, and that he appeared to be sick and suffering considerably from a bad cold; that deceased afterwards went to a drug store and bought some laxative bromo quinine and other medicines for his cold; that on the next day, December 30, 1922, deceased sprained his wrist and on the following day went to his home in Strawn on account of his condition.

By the affidavit of J. S. Crouch, it is shown that he would have, if used as a witness, testified that he was in the banking business in the town of Strawn, and that some time prior to January 6, 1923, a building in Strawn,

owned by affiant, was destroyed by fire; that affiant contemplated rebuilding either a brick building or a building with a brick front; that it became known to J. E. Proctor that affiant intended erecting such a building, and that said Proctor called on affiant for the purpose of securing the contract for the erection of said building; that in the course of the conference between affiant and the said J. E. Proctor the latter proposed to prepare . a sketch for said building and to submit the same to affiant; that affiant made an appointment with the said J. E. Proctor to meet him (affiant) at a garage in Strawn about the night of January 6, 1923; that Proctor failed to meet him, and on the following day when seen by affiant Proctor said that the reason he did not keep the appointment to meet affiant on the previous night was because he was sick and not able to go to affiant's office.

Appellees, in answer to this assignment, urge that there is no bill of exception in the record showing what evidence was heard by the court for or against the motion. It does not appear what oral evidence, if any, was actually introduced in evidence before the court., That all affidavits relied upon, on the ground of newly discovered. evidence, must be shown by bills of exception approved by the court, to have been introduced in evidence and considered by the court. They cite such cases as Colville v. Colville (Tex. Civ. App.) 118 S. W. 870; Ayers v. M., K. & T. Ry. (Tex. Civ. App.) 116 S. W. 612, and Cade v. State, 96 Tex. Cr. R. 523, 258 S. W. 484, by the Court of Criminal Appeals, in support of appellee's contention. In the Ayers v. Ry. Company Case, it is said:

"That a party moving for a new trial on the ground of newly discovered evidence, relying on affidavits, must show by bill of exception or statement of facts that these affidavits were brought to the attention and consideration of the court."

A writ of error was denied in this case.

Appellees further contend that the motion was filed too late; that the verdict was returned May 17, 1923, and an amended motion with the affidavits attached was not filed until June 27, 1923, 40 days after the trial. The court adjourned on June 30, 1923. The amended motion was overruled on June 27th. Houston Oil Co. v. Kimball, 103 Tex. 95, 122 S. W. 533, 124 S. W. 85; Ry. Co. v. Scarborough, 101 Tex. 436, 108 S. W. 804; Smith v. Folmar, 224 S. W. 526, by the Austin Court of Civil Appeals.

[6] The granting of a new trial is largely within the discretion of the trial court. However applicable or pertinent the cases cited by appellee are, we do not think that the trial court erred in overruling the motion by reason of the affidavits showing, or tending to show, newly discovered evidence. It was admitted by W. T. Proctor and Mrs. Proctor, his stepmother, that his father had sprained his wrist some days before the trip in question; that, by reason of such injury, he quit work at Brenckenridge and went back to his home at Strawn. Therefore, as to this matter, there is no controversy in the testimony. As to whether he had a cold or not some days prior to his starting on this trip, we do not think is material. If the appellant negligently permitted its car to become cold, so as to cause deceased to take cold, or to make the cold he already had worse, and therefrom deceased was caused to take pneumonia and die, we believe that the defendant is liable in damages, even though the deceased had a cold prior to starting on this trip.

[7, 8] It is further urged that the judgment is somewhat excessive and unwarranted by the facts given in evidence. The evidence on the part of the son and wife of deceased show that he was a brick mason and was earning $11 a day when he worked; that work in this line was not continuous; and that he often had to go from place to place to find work, sometimes working at Strawn, where he lived at the time, and at other times at Breckenridge, Abilene, etc. He was shown to be 42 years of age at the time of his death. When he could not find work as a brick mason, he did whatever he could find to do. Testimony shows that for a while he lived on a farm and made a crop; that he worked at digging ditches at other times, etc. If the deceased had worked at his trade for only half of his time at the stated wages, he would have earned more than $1,600 a' year. Some of the authorities hold that, where the recovery put out at legal interest does not exceed the earning capacity of the deceased, in a case of this kind, the recovery will not be held to be excessive. $12,000, even at 8 per cent., will bring in a return of only $960 per annum. It is held that the question of damages is one peculiarly in the province of the jury to determine, and it is only where it is made to appear that they have abused the discretion lodged in them, will their action be set aside on the ground of excessiveness. Bonner v. Bean, 80 Tex. 152, 156, 15 S. W. 798; Mo. Pac. Ry. v. White, 80 Tex. 202, 15 S. W. 808.

The judgment below for the plaintiffs and against the defendant T. & P. Company is here reversed and judgment rendered for said defendant, with their costs. The judgment for the plaintiffs against the C. & N. E. Company is affirmed, for the full amount of $12,000, with interest and costs.

Judgment reversed in part, and affirmed in part.

## On Appellants' Motion for Rehearing.

[9] Upon a further consideration of the questions raised in appellants' brief, we are of the opinion that there was reversible error in some of the proceedings of the trial court. At least the other members of the court

are now of the opinion that the argument of counsel for plaintiff below, Mr. Shields, to wit, that, if the defendants could find the identical tickets sold to Proctor and his son, there was no reason why they could not have found, other tickets sold to other passengers on the train and have them testify, and that the reason they did not have them testify was because such passengers would not testify contrary to the testimony of W. T. Proctor, etc., was unwarranted and prejudicial to defendants' rights. The defendants were informed, by reason of the suit filed, that the deceased and his son bought tickets at Strawn for Breckenridge, and it was much easier for them to identify the purchasers of these tickets than it was to identify the purchasers of tickets to other places, especially if these two tickets were the only tickets sold on that day for the train from Strawn to Breckenridge, even if they could have identified them at all. It was not incumbent on defendants to prove their innocence, but it was incumbent upon plaintiffs to prove their case.

[10] Question No. 2, submitted to the jury, was:

"Did the agents and servants in charge of said car permit it to become cold?" To which the jury answered "yes."

And then the court submitted the following interrogatories:

"If you have answered the preceding question yes, then answer the following question:

"Question No. 3: Was such servant or servants in charge of said car that permitted it to become cold guilty of negligence as that term is defined in the first paragraph of this charge? Answer yes or no. A. Yes.

"If you have answered question No. 1 yes, then you will answer the following question:

"Question No. 4: Did the deceased, J. E. Proctor, contract or take cold on account of the cold condition of the car? Answer yes or no. A. Yes.

"If you have answered question No. 4 yes, then answer question No. 4a.

"Was the cold condition of the car, if it was, the proximate cause of the deceased contracting or taking cold? Answer yes or no. A. Yes.

"Question No. 5: Did pneumonia set up as the proximate result of his taking cold in said car or coach? Answer yes or no. A. Yes.

"If you have answered question No. 1 yes, then answer the following question:

"Question No. 6: Was the power of resistance of the deceased so lowered or weakened by exposure to cold in the car as that pneumonia later proximately resulted. therefrom? Answer yes or no. A. Yes."

It is urged that these issues are leading and suggestive to the jury of answers expected to be made in answer to them and invade the province of the jury in depriving them of the right to pass upon the issues of fact involved in the case. My associates are of the opinion that the assignment attacking the submission of these issues in the form

given should be sustained. They have concluded that, by the form of the questions propounded in these issues, it is assumed that the car did become cold, which was a question upon which conflicting testimony was offered, and that at least as propounded the several questions indicated to the jury that, if they should answer each of them in the affirmative, they would be so answered as to justify a judgment for the plaintiffs. The writer, while he recognizes the fact that the form of the issues submitted were perhaps not happily worded, or free from criticism, and that they could have been submitted in a form free from such criticism, yet, inasmuch as the jury was instructed that they should answer question No. 3, if they had answered question No. 2 in the affirmative, and that they should answer No. 4, if they had answered question No. 1 in the affirmative, and they should answer question No. 4a, if they answered question No. 4 in the affirmative, the writer believes that the issues 3, 4, and 4a, the answer to each depending on the affirmative answer to some preceding question, were not in a form which invaded the province of the jury. But the majority think otherwise.

[11] The trial court did submit a number of special issues tendered by defendants, and a number of instructions with reference to the issues involved in the case, but he failed to submit any one of several issues tendered involving the question as to whether at the time the deceased arrived at Cisco, or at the time he got on the train at Strawn, he was in good health and strong. The defendants introduced several witnesses who testified to a state of facts tending to show that, for several days prior to the trip from Strawn to Breckenridge, the deceased was suffering from a severe cold. The issues submitted were perhaps not in such form as to elicit answers which would have been determinative of any material fact in the case, but at least they were suggestive to the court of the need of submitting an issue so determinative, or at least instructing the jury on the duty of railroad companies as to keeping their cars reasonably comfortable for persons in ordinary health. There are authorities supporting the rule that, unless a carrier receives a passenger with notice of his disability or sickness, the carrier in the exercise of due care is only required to keep its cars reasonably warm for persons in good health and strong. 10 C. J. pp. 961, 962, and Marcott v. Ry. Co., 147 Wis. 216, 133 N. W. 37. The case of M., K. & T. Ry. Co. of Texas v. Byrd, by the San Antonio Court of Civil Appeals, 40 Tex. Civ. App. 315, 89 S. W. 991, writ of error refused, is to the contrary. We believe that the fact that the deceased was suffering from a cold, or had influenza or pneumonia, all of which questions were tendered as issues and refused, would be material upon the issue as to whether he would

have died therefrom, irrespective of the cold condition of the car, if it was cold. If upon another trial the evidence should justify the submission of this issue, the trial court may submit it.

For the reasons stated, the judgment heretofore rendered, except as to the judgment in favor of the receivers of the Texas & Pacific Railway Company, is set aside, and the judgment below is reversed, and the cause remanded.

BUCK, J., dissenting in. part.